13-4199 Curtis Wheat v. Fifth Third Bank Argument is not to exceed 15 minutes per side. Ms. Forston for the appellant. May it please the court. My name is Sandra Fortson. I'm a member of the Ohio Bar, and I am the attorney representing Mr. Curtis Wheat in an action he filed after he was terminated from his employment with Fifth Third Bank. The allegation was that the termination was based on a violation of Title VII of the Civil Rights Act of 1964 and the Ohio Revised Code 4112. I would like to reserve 3 minutes of my time for rebuttal, Your Honor. We are here to ask the court to reverse the grant of summary judgment and remand this case back to district court for a hearing. Our argument for the request is that there were several genuine issues in dispute when the summary judgment was awarded. The reasons for summary judgment being awarded, let me go back, Fifth Third basically moved for summary judgment based on three reasons. One was they argued that Mr. Wheat could not prove that he was treated differently from any other employee. Two, they argued that Mr. Wheat could not show that Fifth Third's legitimate or alleged legitimate reason for his termination was not legitimate. And the third reason was that they argued that Mr. Wheat would not be able to show pretext. The judge or the court subsequently did in fact award summary judgment. And two of the bases, one basis was the argument that Mr. Wheat would not be able to establish a prima facie case. So that really goes to the question who is similarly situated and who is it that you think would be a comparable person that the district court wrongfully ignored? Your Honor, I'm giving you a few more facts that would probably clear this up, your question. Mr. Wheat and a Caucasian employee, Mr. Wheat is an African American, Mr. Brad Hatfield, a Caucasian employee, they had an altercation and they both participated in the altercation. Mr. Wheat was terminated and Mr. Hatfield was not. Mr. Wheat had almost ten years, he was one month shy of ten years of employment with Fifth Third. Mr. Hatfield had maybe about two years with the company. So my recollection is that the district court said that Hatfield was not similarly situated. Yes, Your Honor. And what's wrong, tell us what was the error of the district court? The reason behind the court's decision that Mr. Hatfield was not similarly situated was based on the fact that they argued that they were not in, one of them argued that Mr. Wheat was actually an auditor and Mr. Hatfield was a payment processor. Your Honor, in essence, Mr. Wheat himself was actually still titled as a payment processor. He had been a payment processor the entire time that he was employed by Fifth Third. He actually had begun doing auditor duties, but his title was never changed. And the auditor duties actually still were similar to the duties of a payment processor because he was actually just reviewing the work of the payment processors, although he was not a supervisor. So under our case law from the Sixth Circuit, we have a case called Ercegovich, which says that the key is, are they similarly situated in all of the relevant aspects? What would you say are the relevant aspects as between your client and Hatfield? Your Honor, in fact, we did quote that case or cite that case in our brief. And the similar, they were similar, and the position was similar. The duties were a bit different. It's similar to having someone working at a post office and the clerk maybe working on the mail, and then the mail, another person reviewing it. So the duties... But shouldn't the similarity not go to their duties, but go to, were they treated similarly for similar conduct? That's correct. In other words, if we had two people come in here and start fighting, we would want to see whether they were similarly treated for fighting in this room. That's correct. Your Honor, that was one of the court, and the case law pretty much has said that we're looking at more relevant factors than just the duties. There was the case of Bobo versus UPS, and where they said that exact correlation is not necessary. So there was not a need for there to be a direct correlation in the duties. What they should have been looking at is not only the actions and the severity of the actions by the two participants, but they should have... It's really important to note that Mr. Wheat and the comparator both worked for the same supervisor in the same section. So the only distinguishing factor that the court found was that they said that Mr. Wheat was now performing the duties of an auditor. So if we get beyond the prima facie case, we then need to look at the pretext. Yes, Your Honor, and there's numerous evidence that the brief cites that shows a pretext, numerous inconsistencies that the court took it upon itself to resolve on its own as opposed to looking for corroborating evidence. There was, for instance, one of the reasons that was cited for Mr. Wheat being terminated was also the fact that they said that he made a veiled threat. So that was one of the different factors that they stated distinguished him from Mr. Hatfield, when in fact, Mr. Wheat denies making that statement. There's no corroborating evidence except for the HR person, Ms. Healy, who made the decision. And Mr. Wheat's prior supervisor, who was also in the meeting when that occurred, did also state that the statement was made. However, he also stated he didn't see it as a veiled threat because he knows Mr. Wheat and he thought that when he made the statement, he was going to bring in all of the evidence that he kept papers on everything that happened and he was just going to show up with those papers. The reason that becomes a pretext is the fact that Ms. Healy basically said that Mr. Kerfess, the supervisor, had participated in the decision to terminate Mr. Wheat, when in fact, first of all, he stated that he was not, when he testified at his deposition, he was not a participant in that decision. So that was another inconsistency. But also, it's they would have discussed it and decided that, and he would have known that that was the reason why Mr. Wheat was terminated. Wasn't one of the reasons alleged to be that Mr. Wheat did not cooperate in his interview with, I guess it was with Healy? Yes, Your Honor. And we will submit that he was not cooperative and Mr. Wheat admitted that. But he was treated differently during his interview. He was interrogated as opposed to, he wasn't asked what happened. On the other hand, when you look at the comparator, the comparator actually did testify that he was asked to explain what happened and then he was told that he did nothing wrong. He was also told to go home and come back, whereas Mr. Wheat was told to go home and they would call him and let him know when he could come back after they conducted an investigation. That was another distinguishing factor. The, but it's, clearly there were different standards that were applied in the treatment of Mr. Wheat and his comparator. And what's really, really important is to note that Mr. Hatfield, the comparator's, his behavior was more egregious than Mr. Wheat's behavior. In fact, he actually, that when they were arguing, he actually slapped Mr. Wheat's hand. Mr. Wheat did use some profanity in response, but Mr. Wheat was terminated for the profanity. Mr. Hatfield was not terminated for actually assaulting him. And he, Mr. Hatfield does, did testify that he actually told them about that when he interviewed the first time. And he, subsequently he was terminated for that action, but it was after Mr. Wheat filed his EEOC complaint. Mr. So the fact that Mr. Hatfield was eventually terminated might suggest that when the employer learned about Hatfield's behavior, then the employer treats the two of them similarly. Yes, Your Honor, that is what the employer would like us, for us to believe. However, Mr. Hatfield testified that he advised them before Mr. Wheat was terminated, the same day that the altercation occurred. So your position is that the bank, I can't remember if this is the bank. It is. Yes, this is a bank. The bank really was just reacting to the charge that was Mr. Hatfield's words when he was deposed. It was a cover up, to cover up for what they did for Mr. Wheat, because he was given a counseling and he was told he did nothing wrong. Thank you. May it please the court, my name is Donyetta Bailey and I represent the Apelli Fifth Third Bank. And we are here today asking the court to uphold Chief Judge Susan DeLotte's decision to grant summary judgment in its favor. The reason that Susan Judge DeLotte granted summary judgment is because the plaintiff has failed to establish a prima facie case, specifically that he is similarly situated to Brad Hatfield in all relevant respects, which is a standard required by this case. The reasons why Brad Hatfield and Mr. Wheat are not similarly situated are three reasons. Number one, Wheat and Hatfield admittedly had different job duties. Number two, Wheat was the initial aggressor of the dispute. And number three, Wheat made veiled threats and acted aggressively during the investigation, which is something that Hatfield didn't do. So I want to talk about those three specifically. The first one being the job duties. Wheat's own acted as a payment processor. He was an auditor. Why does that make any difference? Great question, Your Honor. The reason why that makes a difference is because it was this difference in job duties that actually started the dispute. As a payment processor, your job is to actually reconcile the checks for Fifth Third's customers with their account and then scan them and mail them back. As the auditor, your job is to check the work of the payment processor. The very reason why Curtis Wheat initiated the dispute is because Hatfield was upset about his audit of his work. So to say now that the difference in job duties is not relevant makes no sense because that was the initial thing that started the dispute. Wheat testified conclusively that he saw Hatfield go over to the workstation and pick up his badges. He claims that Hatfield made a phase and that he assumed that the reason why Hatfield made the negative phase was because he wasn't pleased with Wheat's audit of his work. So suppose hypothetically that the dispute starts about some silly thing that has nothing to do with their job, like whether they're putting their trash in their trash cans. You know, something that's totally a personal kind of thing. Would then the difference in job duties be relevant? Well, that would change the nature of the facts that we have. I can't really answer that in that situation. The job duties might not be relevant, but to me, because the dispute was over, the job duties is relevant in this case. So the key, in your view, is whether the dispute relates to the job. For this particular case, yes, Your Honor. In addition to the fact that Wheat was the initial aggressor, and in addition to the fact that Wheat acted differently during the investigation, all three of those things together make them not similarly situated. And the key cases that your opponent mentions are Ercegovich and Bobo. How would you apply those cases here? Well, in the Bobo case, they weren't similarly situated. They were arguing about an exact correlation, and that's not what we're arguing about here. I'm not saying that it has to be an exact correlation. What I'm arguing is that the Ercegovich case says it has to be similarly situated in all relevant respects, which means the aspects of the employment that are relevant must be nearly identical. In the Ercegovich case, this court held that they were similarly situated because there was a reduction in force, and they were both HR managers in the same department that got reduced. In this situation, I'm arguing they're not similarly situated because the conduct was different, the difference in job duties is what caused the dispute, and his behavior during the investigation cannot go unrecognized. During the investigation, Wheat's own testimony established that he was outrageous during the investigation. Specifically, he threw his badge across the table and resigned. He refused to answer questions. He admitted in his deposition testimony that he talked over the HR manager when she was trying to talk to him. Hatfield did not do any of those things during the investigation. I thought that there was the argument made by your opponent that Mr. Wheat was treated differently by Healy during these inquiries that Healy was making of Wheat on the one hand and of Hatfield on the other hand. That's a great question. In order to survive summary judgment, he has to produce evidence, and he has mere speculation about how he thinks the interview with Healy and Hatfield went. He has not produced a deposition or an affidavit from anybody that was in the room when Healy did her investigation with Hatfield to actually show the court that he was treated differently. The only evidence in the record establishes that Healy asked the same questions of Mr. Wheat that she asked of Mr. Hatfield. The only difference being that Wheat testified he refused to answer her questions because he himself determined that they were irrelevant, he was angry, and he was rude and nonresponsive. There is no evidence in the record to show that Healy acted differently in the investigation with Wheat versus Hatfield. Weren't depositions taken about what happened in the room? I'm sorry, Your Honor. Can you repeat the question? Weren't depositions taken about, among other things, what occurred in the room with the two employees? Yes, Your Honor. The deposition of Jason Kerfess, the supervisor for Fifth Third, was taken, and the deposition of Mia Healy, the ER manager that made the decision, was taken. And they both testified in this case that Ms. Healy conducted the investigation of Wheat and Hatfield the same. And Wheat has produced no evidence in response to summary judgment to the contrary. In addition to, I think one thing that's key is that Wheat was the initial aggressor. And his conduct and what happened. That's disputed, though. That's the problem here. Mr. Wheat doesn't agree with that, and the two people that were involved don't agree. So it would seem that that's a disputed factual matter. Well, no, Your Honor. Wheat does agree that he was the initial aggressor. He testified that he started the argument by walking up to Mr. Hatfield and saying, do you have a problem with me, when Mr. Hatfield was revealing his words. Yeah, but then he walked away. Then who walked away? Wheat. Well, it doesn't matter, Your Honor. In my opinion, that makes this case... Physical altercation. I'm sorry. The physical altercation was what I was referring to in terms of who was the aggressor. Well, Your Honor, in Love, this court held that it doesn't matter what happens after you start the argument. The issue is who started it, and everything else that occurs after it is a continuation. And in this case, you all held that the plaintiff was not similarly situated because the plaintiff in Love was the initiator. So even though in that case, Love, the plaintiff, ended up getting beat up by Bigelow, this court... It doesn't matter what was initiated. In other words, again, talking hypothetically, if you have two coworkers and one of them starts verbally an argument, that's different than if one of them starts punching the other one. Well, Your Honor, this court didn't hold that in Love v. Kent. In that situation, all the plaintiff did was get out the car and start the verbal argument, and then he was assaulted by Bigelow. And in this case, this court held Love never would have suffered his insult if he had not backed up his truck to begin a confrontation with Bigelow to begin with. So I argue that this case is exactly analogous to the situation that's happening here. In this case, we initiated a verbal argument, and according to his testimony only, he's claiming that Hatfield hit him, which is not clarified in the record. But let's assume for a second that we initiated a verbal altercation, and then Hatfield did swat his hand away because his fingers were in his face. In Love, Love initiated a verbal altercation, and Bigelow assaulted him. And this court held that because Love was the one that started the verbal altercation, that the physical assault that happened afterward did not make them similarly situated and dismissed the case for failure to establish a prima facie case of race discrimination. So I argue that based on this court's precedent that's already been set and the precedent by similar cases in the other federal courts that deal with similarly situated based on dissimilar conduct, that Wheat has not established a prima facie case. In addition, he's failed to establish pretext in a situation. He has not produced any evidence to establish pretext, which according to this court requires one of at least three things. Number one, that Mia Healy's decision was not based in fact. He's put forth no evidence to that. Number two, that the reasons that she set forth for the termination did not actually motivate her decision. He hasn't put forth any evidence to that either. Or number three, that the conduct was insufficient to warrant termination. He hasn't put forth any evidence to that either. As the district court pointed out, he was fired because his conduct in employment was outrageous. Excuse my language. He repeatedly yelled and called Mr. Hatfield a bitch over and over and over again. During the investigation, he threw his badge across the room. When asked whether or not he would engage in similar conduct in the future, he said he would do everything exactly the same. He never got a supervisor involved to avoid the dispute. He made veiled threats that Monday was going to be a big day, and when asked to clarify what those statements were, he refused. In addition to that, this is summary judgment, so we're supposed to take the evidence in the light most favorable to the plaintiff here because you want summary judgment. So why wouldn't Monday's going to be a big day mean he's going to come in and appeal any decision or something else that's innocuous? Your Honor, let's assume that it means that. At the end of the day, the issue here is whether or not Fifth Third, Mia Healy's interpretation of what he meant, does she have a good faith belief that that's what he meant, and she didn't. She testified that when he said Monday was going to be a big day, that she took that to mean that it was a threat to other employees. You know, we're running into these disputes of fact here. There was somebody else who said to her, I don't really think that was a threat. His supervisor didn't think it was a threat. He was not the decision maker. Mia Healy was. Well, I'm not talking about who made the decision. I'm talking about a dispute of fact over, for example, whether it was reasonable to think it was a threat when somebody is saying to her, who knows this man pretty well, no, that wasn't a threat. Well, Your Honor, it has to be a material fact. So even, it doesn't matter. Well, you just told me it was material, because it was one of the reasons that Fifth Third was going to fire him. I think where the clarification comes in, it's not material, because it doesn't matter what Mr. Wheat meant. What matters is what Ms. Healy thought he meant, and as long as Fifth Third can produce evidence. Her belief has to be reasonable. I mean, she could think anything she wants to, but the fact finder is entitled to look at all the facts and circumstances in determining what the true facts were. And the problem is all these things are disputed. It's disputed whether they were comparably situated, and it's disputed as to who was the aggressor, and it's disputed as to exactly what occurred, and yet we've got a summary judgment here. Your Honor, I don't think that any of those things are in dispute. He conclusively testified that he was acting exclusively as an auditor, so I don't see a genuine issue of material fact concerning whether he was an auditor or a payment processor. Well, I don't know if I agree with you that the job title is germane to whether they were similarly situated. Well, I don't agree that the job title is germane to whether or not they're similarly situated, Your Honor. My position is that it's the job duties. You've said that several times. It's the job duty. I just want to be clear that I'm arguing that makes them not similarly situated, and that's particularly relevant to this case because it's the difference in job duties that started the dispute, and I believe that's why the district court granted summary judgment and said they weren't similarly situated. Well, you know, you keep going back to that, that he started the dispute, but Hatfield actually conceded that he was the aggressor. I don't see where Hatfield conceded that he was the aggressor at all, Your Honor. Where is that coming from? Well, I can't point to it because I don't have the record open in front of me, but I have notes indicating that Hatfield said, no, I was responsible for what happened. No, Hatfield never said that, Your Honor, and that's not in the record. All that Hatfield said was that he was approached by Wheat initially when he came into work and was looking at his batches, and Hatfield confronted him and said, do you have a problem with me? Wheat confronted Hatfield? Yes. But I thought that what happened is that the initial disagreement subsided and then Hatfield re-initiated the ultimate disagreement. Well, I don't view them as two separate altercations. I view them like the court did in Love, that it's a continuation of the first. That's how you view them. Yes. But Love, I've just checked Love. Love is an unpublished case from, like, 1990. That's right. Am I right? Yes, Your Honor. So it's not a binding precedent, and so we need to figure out what should happen in this kind of a circumstance. Yes, Your Honor. But there are other cases from other federal courts, like the Bowles v. Walmart case, where Bowles touched a female employee's buttocks and she threw orange juice on him, and then he did something physical back. And the court in that case also said that if you initiate the dispute, whatever happens afterward makes you not similarly situated. And so Fifth Third's position is that had— That seems like a really different case. If somebody touches somebody's buttocks to start a disagreement, that's a physical touching, whereas here you were saying the disagreement started because of words that Wheat uttered. Am I missing something? It just seems that those are two very different kind of situations. I think they're different in a sense that you're right. One started with words, one started with physical, but I don't really feel like that difference is material. Well, let me ask you this. If after Wheat and Hatfield had words, and Wheat pulled back and went back to his desk, if Hatfield hadn't then approached him, we wouldn't be here today. Isn't that right? No, I don't agree with that. What? I feel like Wheat had options. So when Hatfield approached him after he got the soda and came back and said, do you have a problem with me, Wheat could have got up and went and got his supervisor. He did not have to stand up, put his fingers in his face, and call him a little bitch repeatedly, which is one of the reasons that he got fired, because his conduct specifically violates various Fifth Third policies, as set forth in the brief. And did that conduct occur in the first half of the altercation, or did that conduct occur after Hatfield subsequently approached Wheat? It occurred in the subsequent altercation. But let's be clear, during the first altercation, before Hatfield walked away and came back, Wheat was yelling and Wheat was unprofessional during that first altercation. You would have fired Wheat for that? Yes, because he was so loud and Hatfield was so loud that Jason Kerfess had to be called by Sammy Badawi to come to see what happened. It just so happened that by the time Kerfess got there, the argument had subsided. But Wheat was unprofessional and was yelling on the floor in the very first altercation, which he should not have been. Okay. So we appreciate your argument, if any judge has any other questions. But your red light is on, so thank you very much. Thank you, Your Honor. Your Honor, I'd like to just clear up a few things. Mr. Hatfield did, in fact, testify that he was the aggressor for the second incident. The first incident started with words. They did not get loud. Sammy Badawi did testify that he only was aware of the one incident. He was not involved at all in the first incident because it was not loud. Mr. Hatfield went to Wheat's desk, stood over him, and asked him, do you have a problem with me? Another co-worker asked them to take it outside so that they wouldn't be making noise in the office area. And that's where they were arguing. Both of them were loud. Sammy Badawi testified to that. And then Hatfield testified that he hit Mr. Wheat or slapped his hand. The other thing pertaining to the cases, the four cases that have been cited by the appellee, there's no break in any of those cases where something happened and then the person departed. I would ask the court, at what point if we're going to hold people liable for everything that happened because that person makes a bad comment to you, and does that mean that if you came back and shot the place up that it would be justified? So where do we stop? In this case, Mr. Wheat had gone back to his desk. It was over. So Mr. Wheat got terminated for an incident that was caused by or started by Mr. Hatfield. Mr. Wheat only argued and called Mr. Hatfield, and he actually said, a little bitch, you're a little bitch, and it went after he hit him. That comment was made only after what we're calling the second half of this? Yes, Your Honor. Yes, Your Honor. It was after they were arguing in the hallway, and he slapped his hand, and at that point Mr. Wheat did notify, continuously called him a little bitch, but he didn't hit him back, which I think should be commendable because some men would have a hit for a hit. In closing, the plaintiff would like to argue that there are numerous material facts in dispute in this case, and we would ask that you would remand this court back to the district court for a hearing. Thank you. Thank you both for the argument.